Good morning. I just pleased the court. I'm Michael Keeney, appearing on behalf of Appellant Willie Joe Barnhart. As the court's aware, the brief sets forth on behalf of the appellant about five to six arguments, factual and legal. From the standpoint of today's proceeding, it begins with our first contention that the administrative law judge, on behalf of the commissioner, erroneously rejected the full opinions of two examining medical experts. Dr. Paul Stofas, a psychiatrist, who conducted two examinations of the appellant at the request of the Disability Determination Services, for the state of Oregon, on behalf of the commissioner. And Dr. Shane Hayden, a clinical psychologist, who conducted three examinations of the appellant, on behalf of, at that point, the Department of Adult and Family Services, now the Department of Human Services for the state of Oregon, in connection with Ms. Lehrman's continued eligibility for cash assistance to herself and her children. The standard, as the court is also aware, with regard to rejecting and examining physicians' opinion, is whether or not brief, inclusionary, not substantiated by medical documentation in the record or without. In this particular case, both examinations from Dr. Stofas reflect testing, review of dozens of pages of psychological and mental records, including prior evaluations, and a significant follow-up in his second examination, where he specifically indicated that this particular woman presents well at initial interview, and during the course of the second evaluation, concluded that she presented much better than in reality she functioned. With regard to Dr. Hayden, he, in the initial evaluation, had almost no records, but in a second evaluation, was provided documentation of school records from Ms. Lehrman, which covered pages 8 through 18, contained approximately four evaluations, four intellectual functioning testing, and numerous progress notes with regard to her status as a special education student from second grade through 12th at Woodburn High School, or Woodburn School District. Dr. Hayden conducted extensive testing, and then, with the appropriate records from the Woodburn School District, conducted IQ testing later, and then, four years later, came back, again, and substantial documentation, including Dr. Stofas' two examinations and test conclusions, and at that point, the latest psychological evaluation set forth in this record. Counsel, if we were to agree with you, and Dr. Stofas' and Dr. Hayden's opinions had to be relied upon, what would that demonstrate, in your view? Would that necessarily equate to a finding of disability, and if so, why? What would that point? Would it fully support the remains of our heir, or alleged? That's step three. That's step three and step two, because, in essence, the administrative law judge rejected the somatoform disorder diagnosis from both of these mental health specialists. He rejected the degree of depressive symptoms from both of them. If you recall, Dr. Stofas diagnosed systemic disorder and major depression. I believe Dr. Hayden was major depression. In both cases, the administrative law judge rejected a finding that this woman suffered from an affective disorder that meant part A of the listing. In addition, the somatoform order is most key. What you have here is a woman suffering from major depression from a somatoform disorder, which, as the court is also aware, is unrealistic interpretation of physical signs and symptoms. This woman's credibility is found lacking on the part of the commissioner of ALJ. By accepting the full opinions of these examining physicians, that leads to the credibility finding with regard to the subjective complaints of disabling pain. The psychological overlay of this woman's... Can you back up for a minute? Certainly. If she has this somatoform disorder, how does that support that she has pain? A somatoform disorder would be the psychological evidence to support her complaints of disabling pain. Why would it support that? Because somatoform disorder... So where's the nexus between that and her inability to work? The nexus there is that the pain that's not substantiated by the physical impairments is fully substantiated by the mental impairment. Somatoform disorder, this pain is real to her. Now, it may be psychologically based, but it's real to her. So when she, under, in this case, three different hearings, transcripts of two of them within the record, says that she has to take breaks every half hour when she's doing housework, then that somatoform disorder fully substantiates her testimony with regard to her complaints of pain and disabling pain. Is there anything else I'm supposed to say other than that there was a possibility of that? Stolfa's diagnosed somatization disorder, which is a somatoform disorder. The DSM-IV is set forth with regard to that particular disorder in, I believe, Pellissippi, I believe. Stolfa's diagnosed somatization disorder. Dr. Hayden initially had a rule-out on somatoform disorder, and in his 2000 psychological evaluation, where he had complete access to Dr. Stolfa's reports, diagnosed pain disorder, which, again, is another somatoform disorder. In both cases, they fully substantiate her complaints of disabling pain. The ALJ expressly considered and rejected Dr. Stolfa's diagnosis, didn't he? He did. He rejected that. Why is involving his bailiwick if he gave reasons for that? He rejected Dr. Stolfa's evaluation because the ALJ said he did not rely, he did not address the issue of exaggerated responses and motivation for self-gain. By diagnosing somatoform disorder, Dr. Stolfa's addressed the exaggerated responses. That is a sign and symptom of somatoform disorder. He also rejected Dr. Hayden's opinion with regard to somatoform disorder and quoted heavily from Dr. Hayden's 1996 report, including setting forth in his ALJ decision the GAF in 1996, indicating that Dr. Hayden was inconsistent in the findings of his report when he diagnosed somatoform disorder. But if you review Dr. Hayden's 2000 report, there is no inconsistency with regard to a somatoform disorder. What the ALJ in this particular case was took the signs and symptoms of somatoform disorder and depression, exaggerated responses, unrealistic interpretations of signs and symptoms, and the unremitting apathy and lack of motivation and used them to attack the opinions of these two experts. He also, in essence, cherry-picked. He liked parts of the reports, the reports that favored his rationale for denying his claim of disability, and the parts he didn't like, and he used the signs and symptoms of these mental impairments to, in essence, reject those portions of the experts' opinions. My time is now up, and I have no rebuttal time. MS. GOTTLIEB We'll restore a minute for you if you'd like. MR. BLUM Pardon? MS. GOTTLIEB We will restore one minute for rebuttal. MR. BLUM With the Court's permission, I'll return. MS. GOTTLIEB Just a few more seconds. MR. BLUM Some of your time on my questions and Judge Graber's kind to let you reply. MS. GOTTLIEB Mr. Blum. MR. BLUM May it please the Court, David Blum for the Commissioner. This is truly a run-of-the-mind Social Security disability case where substantial evidence supports the ALJ's findings that Reynolds was not disabled. The ALJ cited two main parts of the evidence in support of his decision. One is the lack of objective medical evidence supporting Ms. Lehrman's claims of disability, and the other part was her own words. MS. GOTTLIEB Well, counsel, this kind of case is somewhat troubling to me anyway, maybe to no one else on the panel, but there clearly is a history here of depression, which at least one of the physicians or psychologists called major depression. And that and some of the other psychological problems that this individual suffers cause them to see the world in a certain way. And it's troubling to me that that is used then to attack the credibility of the person who is experiencing that problem, because their worldview is distorted by the disease of depression or the other things that they're suffering. Could you help me out of that conundrum? And to what extent is it permissible for the ALJ to reject credibility based on the things that are potentially themselves the result of a diagnosed depression or other mental illness? MR. BARTLETT Yeah, I see two parts of that. One is that even if you were to credit that diagnosis of a somatoform disorder as true, which I don't concede, but even if you did, as plaintiff counsel has pointed out, part of the symptoms of that disorder is an exaggeration of claimant's own symptoms or subjective complaints. Even if she believes that she's so disabled, she's exaggerating the severity of the symptoms. But if that itself is part of the disease, I guess that seems kind of a circular problem. For example, someone who is depressed is very apathetic and may be unable to get themselves to work, even though an outside observer could say, get yourself up out of bed and go to work. You know, you're physically able and you're otherwise fine. I guess I'm struggling with the extent to which the question of objective medical evidence fits in with the concepts of depression and somatoform disorder at all. It just seems like a disconnect to me. MR. BARTLETT Yeah, objective medical evidence, a lack of it, is part of the diagnosis for somatoform disorder. But that doesn't mean that the ALD... MRS. BARTLETT And it's different than malingering. I mean, we're assuming here that this is a genuine issue. No one has suggested that it isn't genuine in that sense. And I guess I'm having difficulty with that. MR. BARTLETT I wanted to get to malingering because I think that's a part of this case. But even before I get there, just because someone has somatoform disorder does not necessarily mean the ALJ has to believe everything they say about their limitations. They're exaggerating some of their limitations. One way an ALJ can look at that is to look at what some of the doctors say or other third parties. In this case, for instance, Clayman's mother submitted a questionnaire indicating that Ms. Lehrman's activities of daily living were fairly extensive, including caring for children, doing household chores, even going out to parties, clubs, and bars. She also reported extensive activities of daily living to some of her physicians, including, I believe, Dr. Hayden and Stoltzfus. The other part is malingering. And there is some evidence in this case, more than some, really, that Clayman was motivated by secondary gain, which is really another phrase for malingering. MR. BARTLETT But isn't, I mean, is that really? I thought secondary gain means she's trying to get money. MR. BARTLETT Yes. MR. BARTLETT And, like, isn't that what every claimant of Social Security is trying to get? Everyone who wants disability benefits is trying to get the gain of having the income. MR. BARTLETT  MR. BARTLETT What am I missing there? I mean, I've seen this secondary gain argument in a bunch of cases, and it's not registering strongly with me. I don't quite get it. MR. BARTLETT It goes to her motivation, and it goes to her credibility. If someone keeps repeating that goal and does not necessarily have objective signs that bear out disability, it really puts the ALJ in a difficult position of ever denying such a person who's alleging a diagnosis of somatoform disorder. I mean, how do you find an adverse credibility finding if that person can say, well, you're not going to find any objective findings because that's part of my impairment? And, sure, I've told a lot of the medical providers that I'm not interested in working. I mean, I think it's... MR. BARTLETT It's somewhat bizarre because having that disorder, in a sense, would make one think, on the one hand, that what she says can be disregarded. But on the other hand, it's argued fairly strongly by Mr. Keeney that in light of the disorder, we should believe everything she says about pain because she must feel it psychologically. Which is the right answer? MR. KEENEY I would turn the Court's attention to pages 282 through 284 of the absurds of record. And Ms. Lehrman said a couple of things there that support an adverse credibility finding. One is, although she had indicated on some occasions that she stopped working at AFC because her impairments prevented her from continuing, she told medical providers that the real reason that she stopped working was that KFC did not pay enough to cover her child care expenses. And, in addition, she told her medical providers that not only did she want disability money, but she didn't want to work. She wanted to get married and be supported by a husband and be on disability. Those kinds of statements are fair game for the ALJ to consider when determining a plaintiff's credibility. And it's certainly a rational interpretation of those statements to find that the secondary gain or malingering is just as plausible a diagnosis as is somatophone disorder. In fact, in the DSM, under the discussion of those two disorders, they mention the difficulty of trying to separate them or diagnose them. And under somatophone disorder, particularly, it states that there can be elements of both. And the ALJ here rationally gave more weight to that evidence and indicated that secondary gain or malingering was the prime motivation. Also, even considering the opinions of Drs. Stoltzfus and Hayden, there's contradictory medical evidence that the ALJ rationally and properly interpreted. Several doctors indicated the plaintiff could work, including Dr. Feldman, Dr. Keene, and Dr. Olson, who recommended that the plaintiff exercise more and said that nothing prevented her from working. Dr. Keene was a psychologist, and she indicated that the plaintiff retained the mental ability to perform simple work, which is what the ALJ found that she could do. So given the conflicting medical evidence, it was within the ALJ's purview to resolve that conflict and find that the plaintiff could work. I don't have anything else unless the panel has further questions. I have none. Judge Hall, do you have any questions? No, no questions. Thank you. Thank you. And, Mr. Keene, you may have a minute for rebuttal. Thank you. A couple of quick notes. Betty Lehrman's questionnaire that Mr. Bloom referred to I believe was filled out in 1995. It was one of those daily activities, check the box. I don't recall the specific detail as full as he did, but essentially it said she's a mother with three kids. She tries the best she can, and there is limitations set forth in the questionnaire. Dr. Keene, Dr. Olson, those records go back to 93, 94, 95. It's fine. Their opinions may be different if they review Dr. Stofas' and Dr. Hayden's opinion. Lingering, facetious disorder are both specific disorders under the DSM-IV that must be rejected before a somatoform diagnosis of either somatization disorder or pain disorder is disclosed. Signs and symptoms of depression exist in this case since this woman was eight years old. And as to the work, why she quit her job, she worked for less than a month part-time at Kentucky Fried Chicken in 1988, approximately five years before she filed her first disability application. This woman is impaired dramatically, has an underlying sense of absolute hopelessness and unremitting apathy. Her pain disorder is real to her, is a limitation, functionally, mentally, emotionally, that was not addressed by this administrative law judge, the commissioner, or the U.S. District Court. Thank you. Thank you, counsel. The case just argued is submitted.
judges: Hall, Graber, Gould